UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA SWIRSKI, an individual,<br><br>Plaintiff,<br><br>v.<br><br>PROTEC BUILDING SERVICES, INC., a California corporation; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No: 3:20-cv-01321-LAB-MDD<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Laura Swirski filed this employment action against Defendant Protect Building Services, Inc. ("Protec"), bringing claims of age discrimination while she was employed at Protec as Human Resources Manager. During her employment there from 2014 to 2019, Swirski alleges that she was discriminated against on account of her age, harassed, retaliated against, subjected to negligent and intentional infliction of emotional distress, and constructively discharged. ProTec disputes Swirski's allegations and brings the present Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Motion").

1

The Court has read and considered all documents submitted in support of and in opposition to the Motion. For the reasons discussed herein, ProTec's Motion is **GRANTED**.

## I.    FACTUAL BACKGROUND

### A. Hiring and Employment of Swirski at ProTec

ProTec is a San Diego-based company which provides general contracting services to homeowners' associations across southern California and southern Nevada. (Dkt. 31, Joint Statement of Undisputed Facts ("JSUF") ¶ 1). In January 2014, at the age of 53, Swirski joined Protec as Human Resources Manager. (*Id.* ¶¶ 2–3). She was hired by J. David Rauch, ProTec's President and CEO. (*Id.* ¶ 6). Between that time and her departure from ProTec in November 2019, her salary increased from $55,000.00 to $84,000.00. (*Id.* ¶¶ 4, 70).

On August 2, 2016, Swirski sent an email to ProTec managers with the subject line, "Leaders Listen," and stating in the body of the email that "[l]eaders who don't listen will eventually be surrounded by people who have nothing to say." (*Id.* ¶¶ 14–15). Rauch separately forwarded Swirski's email to Andy Henley, a Business Development Manager at ProTec, inadvertently copying Swirski on the email and stating:

> What a coincidence that this seems so obviously directed at me. . . . Laura seems to be crying out for something—for me to listen to her? . . . The bottom line is that I do listen to Laura. I just don't agree with everything she says. . . . More importantly, she doesn't do what I ask her to do. . . . So, I could reply to her with the following: 'Coworkers who don't listen to (and do) what their boss asks them to do will soon be looking for another job.'

(*Id.* ¶ 17). At a meeting shortly after this email was sent, Swirski asked to speak privately with Rauch. (*Id.* ¶ 18). She informed him that she was

2

uncomfortable with his comments and felt threatened because she wasn't sure whether Rauch was expressing negative comments about her to other coworkers. (*Id.*). She felt that she might be fired. (*Id.* ¶ 122). Two days later, on August 4, 2016, Swirski sent an email to other managers but omitting Rauch, only to then forward that same email to Rauch, apologizing for omitting him. (*Id*. ¶ 19). He replied, stating, "I can empathize with your reluctance to sending me anything. I hope you forgive my transgression 2 days ago." (*Id*.). She responded, "I forgive you . . . thank you for your nice note," and "I copied a distribution list from an email you had sent out . . . so, of course, you weren't on it. Not including you was an oversight on my part and not me being shy." (*Id*.). A few months later, on November 16, 2016, Rauch sent ProTec managers an email with the subject line, "Two Great Articles from Laura," explaining the importance of listening and building personal connections with employees. (*Id*. ¶ 23).

## B. Age-Related Comments

In January 2018, ProTec engaged David Chavez, a consultant, to work with ProTec's executive team and train certain employees to use DiSC, an employee assessment tool commonly used by human resources managers to help promote and improve productivity, teamwork, leadership, sales, and communication within the company. (*Id*. ¶¶ 25, 28–30). The cost of DiSC training for three employees was $6,000.00. (*Id*. ¶ 34). At a meeting with Chavez and ProTec's executive team, Swirski volunteered to train in DiSC. This prompted Candace Allen, ProTec's Chief Financial Officer ("CFO"), to ask Swirski about how long she expected to remain working at ProTec. (*Id*. ¶ 36). On January 22, 2018, following that incident, Swirski emailed the executive team, stating:

> I want to fully answer the question Candy [Allen]

> asked at today's meeting. She asked me how long I
> would be around in relationship to the company
> spending $6,000 for DiSC training. . . . I want to be
> clear—I have no plans to retire and I intend to work
> at ProTec for a long time. It's an exciting time and
> I'm excited to be a part of it. I value being part of the
> team and I want to continue to learn and grow.

(*Id*. ¶ 37). In response, Rauch emailed, "Sounds good Laura. I'm glad to hear that," while Allen responded "Yay!", and other coworkers responded with smiley-face emojis. (*Id*. ¶¶ 38–39). In a meeting a few days later, on January 23, 2018, Allen stated to Swirski that she didn't mean to offend her or imply that the question was at all age-related. (*Id*. ¶ 40). On March 13, 2018, Swirski sent an email to herself summarizing that interaction, acknowledging that Allen told her the question had nothing to do with her age or retirement, and that she "[c]annot verify intent; although this is not the first age related comment directed at me or regarding other employees/job applicants/candidates." (*Id*. ¶ 46). She further wrote, "I stated it was a question asked directly of me (the second oldest in the room besides Dave) and to no one else" and "that to an outside third party it could appear as an age-related question and cross over the line into discrimination." (*Id*.). Swirski ultimately received the DiSC training. (*Id*. ¶ 42).

Swirski believes others have made age-related comments to her on different occasions. For instance, at a March 2018 retreat, following a discussion about each member's position and where each of them sees those positions in the future, Chavez stated in front of the executive team that it was unknown for how long Swirski would remain working at ProTec, making her feel like she might be fired. (*Id*. ¶¶ 43–44, 122). Prior to that, Rauch and Allen had joked to Swirski about her lack of technological proficiency—jokes she believes were age-related. (*Id*. ¶ 45). And on

4

April 6, 2018, Rauch transferred the responsibility of maintaining an Excel spreadsheet with a company staffing plan from Swirski to his Executive Assistant, Katie Mullins, because, as he told Swirski, Mullins was younger and better at technology. (*Id*. ¶¶ 49–50). Swirski had also heard Rauch and Henley make comments that certain potential employees were "too old" or "fat" to "do the physical work of a technician" because it is "dangerous" to "put them up on a ladder." (*Id*. at ¶¶ 120–21).

Between April and December 2018, Swirski and Allen had a comfortable relationship, exchanging pictures of dogs and friendly email banter. (*Id*. ¶¶ 52–54). However, between April 2018 and mid-January 2019, Rauch discussed some human resources issues with Allen, not Swirski. (*Id*. ¶ 59). When Swirski asked Rauch why he didn't consult her, he responded, "Well, I value Candy's opinion." (*Id*.). During that same time frame, Rauch and Henley also had discussions about discharging an employee without including Swirski in the conversation. (*Id.* ¶ 56). Rauch explained Swirski wasn't included because these discussions often occurred at 6:00 p.m., and Swirski was not usually in the office at that time. (*Id*. ¶ 57).

On January 16, 2019, Rauch sent Swirski and other ProTec employees an email commemorating Swirski's five-year anniversary with the company, stating in part, "Please know that we appreciate you and all look forward to another 5 or 15 years." (*Id.* ¶ 61). She responded, "I know I'm lucky," and "I'm sure the next 5 years will fly by, too!" (*Id*. ¶ 63). In February 2019, Swirski's husband passed way, and when she returned to work, Rauch told Swirski that she should bring her puppy, Gunny, into the office instead of leaving her home all day. (*Id*. ¶¶ 66–67). Swirski began bringing Gunny into the office every day. (*Id*. ¶ 68).

### C. Branco Litigation

Around August 2019, ProTec was tending to pending sexual harassment and fraud claims made against the company by a former employee, Jenny Branco. (*Id.* ¶ 77). Swirski was the main point of contact with ProTec's employment attorney, Michael Drenan, who requested several documents from ProTec in order to evaluate Branco's claims. (*Id.* ¶¶ 76, 78). At one point, Branco's attorney suggested to Drenan that "due to Laura [Swirski], [Branco's] point of contact at Human Resources, being so dismissive at the time of her initial formal harassment complaint Juan, agent at Defendant, she [Branco] no longer felt comfortable addressing the issue at length with her." (*Id.* ¶ 99).

Drenan sent updates about settlement demands and offers, which Rauch forwarded to the executive team, copying Drenan and Mullins. (*Id.* ¶¶ 79–80). During the course of various exchanges between the executive team and Drenan, Allen asked, "Would [it help] having documented proof that her alleged sexual harassment claims were actually addressed by myself and HR? And that HR (Laura) [Swirski] has confirmation emails from [Branco] that things [were] handled? I think Laura also has [a] document disproving other statements she has made in the claim." (*Id.* ¶ 81). On August 29, 2019, Swirski responded to Allen's email, copying the executive team but removing Drenan from the email chain, stating:

> I appreciate the suggestions/help. . . . I'm working with Mike as his point of contact and am providing him all the material and information I have and what he needs/wants. . . . Rather than a variety of us sending emails to Mike, perhaps we could discuss amongst ourselves first. . . . Also, can we be mindful of staying in our respective lanes?

(*Id.* ¶ 82). In response, with the executive team still copied, Rauch wrote:

6

> Candy [Allen] (and I) is staying in her lane. Jenny was her employee and Candy is resentful that the employee is seeking to perpetrate fraud upon us. . . . That fraud, and Mike [Drennan]'s subservient attitude (non-fighting) towards her attorney is what frustrates Candy (and me). . . . Plus, if we knew that you had the same level of concern about spending $20,000 to $70,000 then I think we would feel more comfortable to just let you handle this litigation. But, we have to live with the consequences of not having that cash. . . . But, maybe our perspective is off so let's put this on calendar for discussion Monday.

(*Id.* ¶ 84). Swirski replied to Rauch and the executive team, writing in part:

> I've asked you in the past that you speak with me directly if you have a concern about me and not send an email to all to vent your frustration at me at my expense. I would give you the same consideration. . . . I certainly don't like that a former employee has brought a claim against ProTec. And, I am concerned. If I don't seem to have the same level of concern as you and Candy, I would have to say that is your perception. My display of emotion at work may be different than yours or Candy's. That doesn't mean I don't care greatly. . . . I have been in communication with Mike and if you or Candy had asked me, I could have told you that I have provided the personnel file to him that includes the arbitration.

(*Id.* ¶ 85).

### D. Swirski's Retirement

As of August 30, 2019, Swirski was feeling undermined by Rauch's continued interference in the Branco lawsuit, though she believed that he might have gotten involved in the matter regardless of Swirski's age. (*Id.* ¶¶ 88–89). At this time, she not only continued to feel grief over the

7

passing of her husband, but also separately felt responsible for a $103,000 penalty that the IRS sought to impose on ProTec for its failure to file 1095-C forms with the IRS and provide them to employees. (*Id.* ¶ 88). Tensions were further increased when, on September 16, 2019, Rauch informed Swirski at a weekly executive team meeting that some employees had complained about Swirski's dog, believing she was receiving special treatment by being allowed to bring Gunny to work and because the baby gate and piddle pad placed in her office made employees feel like they couldn't talk to her. (*Id.* ¶ 102). Swirski later noted that these complaints "had Candy's fingerprint all over it. It is consistent with her pattern of behavior of harassment. She tells Dave [Henley] there is an issue and has him fight her fight. She is passive-aggressive and he is so blind to her manipulation of him." (*Id.* ¶ 103).

Additionally, on three separate occasions, Allen mentioned to Swirski in passing that taking her dog to hospitals and retirement homes as a therapy dog would be a good retirement job for Swirski. (*Id.* ¶ 104). But Swirski told Allen that she had no intention of retiring. (*Id.* ¶ 105). In fact, as of September 11, 2019, Swirski had intended on resigning in February 2020, and had even drafted a resignation letter reflecting this resignation date. However, on October 28, 2019, Swirski gave ProTec her letter of resignation, stating that her last day would be on November 8, 2019. (*Id.* ¶ 106). Rauch separately emailed Chavez and stated that Swirski's resignation was a "godsend" and that he'd intended on terminating her the coming Friday: "I guess she was getting frustrated from [C]andy and I calling her on her not being all in." (*Id.* ¶ 107). Swirski also informed Drenan of her retirement and explained, "I'm able to not need to work 'for money' anymore. . . . I had a meeting with my financial planner a few months ago and he told me that I'm financially independent

and I don't need to work." (*Id.* ¶ 108). Swirski was 59-years old when she retired. (*Id.* ¶ 110).

ProTec replaced her position of Human Resources Manager with that of Human Resources Director, and hired Barbara Jimenez, who was 52-years old, for the position. (*Id.* ¶¶ 114, 119).

### E. Swirski's Lawsuit Against ProTec

On July 13, 2020, Swirski filed this action against ProTec, alleging that she was forced to resign from ProTec due to the allegedly abusive and hostile work environment, which was motivated by discrimination against Swirski due to her age. (Dkt. 1, Complaint ("Compl.")). Her Complaint alleges twelve causes of action, including: age discrimination under the Age Discrimination in Employment Act of 1967 ("ADEA") and California's Fair Employment and Housing Act ("FEHA"); hostile work environment under FEHA and Title VII of the Civil Rights Act of 1964 ("Title VII"); retaliation under Title VII and FEHA; wrongful discharge in violation of public policy; failure to prevent retaliation and harassment; violation of unfair business practices under California's Unfair Competition Law ("UCL"); intentional infliction of emotional distress ("IIED"); and negligent infliction of emotional distress ("NIED"). (*Id.*). Following an opportunity to complete discovery, ProTec filed the present Motion for Summary Judgment on May 13, 2021, seeking judgment on Swirski's claims for constructive discharge, age discrimination, hostile work environment, retaliation, failure to prevent retaliation, violation of unfair business practices, IIED, and NIED. (Dkt. 32). ProTec additionally seeks judgment on Swirski's request for punitive damages. (*Id.*).

### II.   STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56(a) where the movant "shows that there is no genuine dispute as to any material fact

9

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* at 324. The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* (citation omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 242. The Court does not make credibility determinations or weigh conflicting evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Rather, the Court determines whether the record "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

III. **ANALYSIS**

A. **Constructive Discharge**

The parties first disagree regarding whether Swirski establishes genuine factual disputes for her wrongful constructive discharge claim. (*See* Dkt. 32-2 at 17–18; Dkt. 34-1 at 17–19). A constructive discharge

10

3:20-cv-01321-LAB-MDD

can serve as an adverse employment decision supporting a claim for discrimination. *See Jordan v. Clark*, 847 F.2d 1368, 1377 (9th Cir. 1988). Constructive discharge occurs when, looking at the totality of the circumstances, "the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) (quoting *Brooks v. City of San Mateo,* 229 F.3d 917, 930 (9th Cir. 2000)) (internal quotation marks omitted). "This 'aggravated' claim arises when plaintiff 'presents a worst case harassment scenario, harassment ratcheted up to the breaking point.'" *Torres v. Nat'l Frozen Foods Corp.*, No. 6:20-CV-01680-MC, 2021 WL 1740245, at *5 (D. Or. May 3, 2021) (citing *Pennsylvania State Police v. Suders*, 542 U.S. 129, 131 (2004)). Both a hostile work environment and adverse employment decisions can support a constructive discharge theory. *See Penn. State Police v. Suders*, 542 U.S. 129, 140–41 (2004).

While constructive discharge is "normally a factual question left to the trier of fact," *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir. 1987), courts may resolve it as a matter of law where the plaintiff fails to present facts showing that the situation is "sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job." *Poland*, 494 F.3d at 1186.

As applied in this case, the evidence presented fails to show such an objectively egregious work environment that a reasonable person in Swirski's position would feel compelled to quit. Swirski offers certain interactions during her tenure at ProTec as evidence of intolerable conditions. She suggests a "clear and continuous pattern of her

11

colleagues' acts of discrimination," yet notes only the following specific instances: Rauch's August 2016 email inadvertently sent to Swirski; a question posed by Allen at the January 2018 DiSC training regarding how long Swirski intended to remain at ProTec; and a comment made by third-party consultant, Chavez, at a March 2018 retreat about how it was unclear how long Swirski would remain at ProTec.[1] (Dkt. 34 at 17–18). But as explained more thoroughly in the following sections, the evidence at most shows isolated, intermittent remarks made to Swirski throughout a three-year period that caused frustration and discomfort. Rauch's August 2016 email made no mention of age or retirement, but instead focused on her job performance and ability—or, rather, inability—to follow direction. As for comments made by Chavez and Allen, neither of them reference Swirski's age and there is no clear indication that they were motivated by discrimination or occurred because of, or on the basis of, Swirski's age. None of the criticisms made to or about her reference age and Swirski herself testified that she believed at least some of the offending actions may have occurred regardless of her age. (*See* JSUF §§ 89, 123). This is not to mention that the conduct about which she now complains took place over the span of a three-year period, during which time Swirski even had positive relations with some of the coworkers about whom she now complains. (*Id.* ¶¶ 52–54, 67–73).

---

[1] Swirski makes various assertions throughout her opposition brief that aren't supported by citations to the record and are directly belied by the evidence presented. For instance, she suggests that Swirski was denied DiSC training, when the JSUF suggests that she did indeed receive that training. (JSUF ¶ 42). She also suggests that the August 2016 email inadvertently sent by Rauch insinuated that she "was near retirement age," (Dkt. 34-1 at 17). But while Rauch not so subtly alludes to her potential termination, there is no suggestion that his comments are at all related to her age.

Moreover, courts have found that "[a]n employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged." *Poland*, 494 F.3d at 1185 (quoting *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996)). Here, nothing in the record suggests that Swirski ever brought concerns of age discrimination or harassment to the attention of anyone at ProTec. At no point before her retirement did she approach anyone at ProTec to help work through the alleged discrimination and harassment, and in November 2019, she ultimately decided to retire, stating to others that she was in a financial position to do so. (*Id.* ¶ 108).

Because the evidence presented neither indicates improper conduct motivated by Swirski's age nor shows sufficiently extraordinary or egregious conditions that could support a finding of constructive discharge, summary judgment is **GRANTED** insofar as Swirski's claims rely on a constructive discharge theory.

### B. Age Discrimination

ProTec seeks summary judgment as to Swirski's age discrimination claims under both the ADEA and FEHA, arguing that the facts of this case don't create a triable issue of whether Swirski suffered age discrimination.

Under the ADEA, it is unlawful for any employer to take an adverse action against an employee "because of such individual's age." 29 U.S.C. § 623(a). "[A] plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Fin. Servs.,* 557 U.S. 167 (2009). Likewise, under FEHA, it is an unlawful employment practice for an "employer, because of the . . . age . . . of any person to . . . discriminate against the person in compensation or in terms, conditions or privileges of employment." Cal.

Gov't Code § 12940(a).

In general, discrimination can be established in either of two ways—by direct evidence, or by indirect evidence. *Enlow v. Salem–Keizer Yellow Cab Co., Inc.,* 389 F.3d 802, 812 (9th Cir. 2004); *Lowe v. City of Monrovia,* 775 F.2d 998, 1009 (9th Cir. 1985). If a plaintiff has no direct evidence, courts generally employ the burden-shifting analysis laid out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04 (1973). Under *McDonnell Douglas*, an employee must establish that: (1) at the time of an alleged adverse employment action, the employee was 40 years of age or older; (2) an adverse action was taken against the employee; (3) at the time of the adverse action the employee was satisfactorily performing her job; and (4) some other circumstance suggesting a discriminatory motive was present. *See Guz v. Bechtel Nat'l, Inc.,* 24 Cal. 4th 317, 355, 100 Cal. Rptr. 2d 352, 8 P.3d 1089 (2000).

Here, Swirski argues that her age discrimination claim can be established by direct evidence of ProTec's conduct, resulting in "adverse employment actions" and disparate treatment as compared with other coworkers. (Dkt. 34-1 at 20). The Court finds that ProTec's Motion must be **GRANTED** as this claim, as Swirski has not provided direct evidence of any age discrimination.[2]

According to Swirski, she experienced "multiple incidents" of discrimination during her employment at ProTec. (*Id.* at 19). First, she claims that two remarks made to her about her retirement by Allen and Chavez are direct evidence of age-related discrimination. (*Id.*). Direct evidence is "evidence, which, if believed, proves the fact of discriminatory

---

[2] Given that the Court has already found insufficient evidence to make a finding of age discrimination, the Court need not rule on the issue of whether certain of Swirski's allegations are time-barred by the applicable statute of limitations.

animus without inference or presumption" and "typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Dominguez–Curry v. Nevada Transp. Dep't,* 424 F.3d 1027, 1038 (9th Cir. 2005) (internal citations, quotations, and brackets omitted).

Here, Swirski alleges that at a work event for DiSC training, Allen asked Swirski about whether she intended on remaining with ProTec or retiring soon. (JSUF § 36). Later, at a work retreat, Chavez asked employees to state where they see themselves in the future and suggested that it was unknown for how much longer Swirski intended to remain at ProTec. (*Id*. ¶¶ 43–44, 122). But these remarks alone, which don't even reference her age, are insufficient to establish clear discrimination by ProTec, even when considered with the other evidence discussed below. Instead, they appear to be discrete and isolated remarks, and the Court can't infer that they were motivated by discrimination against Swirski on account of her age, as opposed to, for instance, curiosity about her future personal and/or professional plans. *See Ayala v. Costco Wholesale Corp.*, No. 5:17-CV-00720-JLS-JC, 2018 WL 6307891, at *6 (C.D. Cal. Aug. 6, 2018) (holding that a question about an employee's age and a comment that the employee looked good for his age do "not express any limitation, specification, or discrimination" and "fall far short of the specific, substantial evidence a plaintiff must present to create a triable issue of fact"); *McInteer v. Ashley Distribution Servs., Ltd.*, 40 F. Supp. 3d 1269, 1282 (C.D. Cal. 2014) ("By merely asking his age, [employer]'s comment is ambiguous and the Court cannot infer the question is reflective of any discriminatory animus, as opposed to for example curiosity or admiration."); *Korte v. Dollar Tree Stores, Inc.,* No. CIV. S–12–541 LKK, 2013 WL 2604472, at *13–14 (E.D. Cal. June 11, 2013) ("[E]ven when considered with the other evidence presented by

15

[Plaintiff], the stray remarks he documents are insufficient to make out a prima facie case that age discrimination played a role in his termination."). "Courts have regularly held that such isolated remarks are insufficient to create a triable issue as to age discrimination." *Ayala*, 2018 WL 6307891 at *6; *Harris v. City of Santa Monica,* 56 Cal.4th 203, 231, 152 Cal.Rptr.3d 392, 294 P.3d 49 (2013) ("[S]ection 12940(a) does not purport to outlaw discriminatory thoughts, beliefs, or stray remarks that are unconnected to employment decisionmaking.").

Swirski also testified that Rauch and Allen made comments to her about her technological proficiency, but the record appears to suggest that such comments were not clearly motivated by age-related animus, but rather were made in relation to her skills in efficiently creating and managing an Excel spreadsheet. (JSUF ¶¶ 49–50). Furthermore, she claims that Rauch made various comments about not hiring old people because "they are dangerous" and because they "can't put them on a ladder." (Dkt. 34-1 at 20). But Swirski hardly discusses these alleged comments, and the Court therefore finds it difficult to infer their exact context, including when they were made and whom they are meant to reference. Nevertheless, the record reflects insufficient evidence to conclude that these comments were motivated by discriminatory intent, rather than by safety-related considerations for employees who may be performing manual labor as part of their job requirement. The Court also notes that these remarks were not made to Swirski or about her, but instead seem to reference other employees who hold different positions at the company.

Lastly, Swirski can't show that she was replaced by a substantially younger employee. *See O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 313 (1996) ("[A]n inference [that a decision was based on age

16

discrimination] cannot be drawn from the replacement of one worker with another worker insignificantly younger."). She claims that ProTec replaced her with "younger interim and permanent employees" who were paid more than her. (Dkt. 34-1 at 20). Seemingly related to this assertion, she contends that ProTec replaced her with Barbara Jimenez, who was younger than Swirski at the time of her hiring and received a higher starting salary. (*Id.*). But Swirski neglects to acknowledge that Jimenez was 52-years old when she was hired—above the age of forty and only seven years younger than Swirski when she retired. Moreover, Jimenez was hired as Human Resources Director, an elevated position to that of Human Resources Manager, thus providing some explanation for the pay discrepancies between the two positions.

The Court is unable to conclude that the alleged statements and actions attributed to ProTec were motivated by discrimination against Swirski. At most, she's proffered evidence of frustrating and uncomfortable interactions with her coworkers—interactions of the type that permeate any workplace. And as previously established, the only adverse action she identified is her alleged constructive discharge, but the Court has already found that there was no constructive discharge. Even drawing all inferences in Swirski's favor, the Court finds that the offending comments and actions do not lead to the inescapable conclusion of discriminatory intent. Moreover, some of these remarks were not even directed at Swirski. For these reasons, the Court concludes that there are no triable issues of fact on the issue of age discrimination and **GRANTS** summary judgment on these claims.

## C. Hostile Work Environment

ProTec is entitled to judgment as a matter of law on Swirski's hostile work environment claim under both Title VII and FEHA. "The elements of

17

a hostile work environment claim under the FEHA track the elements of such a claim under Title VII." *Reitter v. City of Sacramento,* 87 F.Supp.2d 1040, 1041 n. 1 (E.D. Cal. 2000); *see also Lyle v. Warner Bros. Television Prods.,* 38 Cal. 4th 264, 279, 42 Cal. Rptr. 3d 2, 132 P.3d 211 (2006) ("California courts have adopted the [Title VII] standard for hostile work environment sexual harassment claims under FEHA.").

To establish a prima facie case of hostile work environment, Swirski must establish that (1) she was subjected to verbal or physical conduct based on her age; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment. *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003); *Kang v. U. Lim America,* 296 F.3d 810, 817 (9th Cir. 2002). Hostile attitudes or general incivility aren't enough. Instead, a plaintiff must establish that the workplace was "permeated with discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *See Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65–67 (1986)) (internal quotation marks omitted). To determine whether conduct was sufficiently severe or pervasive, the Court must look to all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, whether it is a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *See Vasquez,* 349 F.3d at 642.

In this case, Swirski argues that she endured hostile working conditions while employed at ProTec, citing four specific incidents: (1) in August 2016, when Rauch wrote to another coworker that Swirski "doesn't

do what [he] ask[s] her to do" and that "[c]oworkers who don't listen to (and do) what their boss asks them to do will soon be looking for another job," (JSUF ¶ 17); (2) in January 2018, when Swirski volunteered for DiSC training, prompting Allen to ask her about how long she expected to remain working at ProTec, (*id.* ¶ 36); (3) in March 2018, when an outside consultant, Chavez, asked her how long much longer she intended to work at ProTec, (*id.* ¶¶ 43–44); and (4) various occasions throughout her employment when Swirski heard Rauch or Henley comment that a potential employee was "too old" or "fat" and that it's "dangerous" to "put them up on a ladder," (*id.* ¶¶ 120–21). (Dkt. 34-1 at 22). Swirski also suggests that comments made to her about her technology-proficiency and her dog lent to this hostile work environment. (*Id.*).

But as ProTec points out, only one of those comments actually references Swirski's age: Rauch's comment that he was assigning a certain task to Mullins and not Swirski because Mullins is younger and better at technology. (Dkt. 32-3 at 23). *See Saqqa v. San Joaquin Cty.*, No. 2:20-CV-00331 WBS AC, 2021 WL 4123841, at *12 (E.D. Cal. Sept. 9, 2021) ("[R]emarks indicating that [Defendant] needed to hire younger managers or that old managers need to retire are simply not severe or humiliating enough to maintain a claim for age harassment under FEHA. Though they may be offensive, a 'reasonable jury would not find [they] created a hostile work environment' or interfered with [Plaintiff]'s employment."). And while Allen and Chavez may have mentioned Swirski's eventual retirement or asked her how long she expected to remain at ProTec, such comments or questions alone are not enough to support an inference that this conduct was severe or pervasive. *See Williams v. Lorenz*, No. 15-CV-04494-BLF, 2018 WL 4003455, at *21 (N.D. Cal. Aug. 22, 2018) ("[T]he Court finds that Defendants' purported

19

conduct—while showing at times criticism, inappropriate comments, or unnecessary instructions—neither was directed towards Plaintiff's . . . age . . . nor did they 'pollute the workplace [and] alter[ ] the conditions of her employment.'") (quoting *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003)) (alterations in original); *cf. Eyraud v. Swift Transportation Corp.*, No. 2:17-CV-00791-JAM-DB, 2018 WL 2157176, at *3 (E.D. Cal. May 10, 2018) (finding that asking the plaintiff, "Exactly how old are you?" or comments that the plaintiff was "old and brittle and [he had] to turn around to look to see where the trailer is going" were not part of a "repeat pattern of discrimination" that would rise to the level of creating a hostile work environment). Nor are the occasional comments about the dangers associated with hiring "old" or "fat" employees enough to support a hostile work environment claim, even where they may be construed as offensive. *See Rhodes v. Scottsdale Cmty. Coll.*, No. CV-18-02063-PHX-RCC, 2019 WL 7194694, at *4 (D. Ariz. Dec. 26, 2019) (finding treatment was not so frequent or severely abusive to create a hostile work environment, even where supervisor called plaintiff "too old" or "too fat" to work in certain positions, cancelled one of plaintiff's classes, and falsely stated his job performance was subpar).

Indeed, the conduct Swirski complains about is not the type of conduct that rises to the level of hostile work environment. "The incidents [Swirski] relies on were sporadic and isolated, and not the type of conduct that can be said to have 'permeated' [Swirski]'s workplace." *Stevens v. Cty. of San Mateo*, No. C 04-02762 SI, 2006 WL 581092, at *5 (N.D. Cal. Mar. 7, 2006), *aff'd*, 267 F. App'x 684 (9th Cir. 2008); *see Meritor Sav. Bank, FSB*, 477 U.S. at 67 ("[M]ere utterance of an . . . epithet which engenders offensive feelings in an employee would not affect the conditions of employment to sufficiently significant degree to violate Title

20

VII.") (internal citations and quotation marks omitted); *Nagar v. Found. Health Sys., Inc.*, 57 F. App'x 304, 306 (9th Cir. 2003) (affirming under FEHA that "[t]he alleged offensive remarks and conduct were insufficiently severe or pervasive to alter the terms and conditions of her employment and thus to create an actionable hostile work environment"). ProTec's motion for summary judgment is, therefore, **GRANTED** as to Swirski's hostile work environment claims under Title VII and FEHA.

### D. Retaliation

Swirski also brings retaliation claims against ProTec with respect to her age discrimination and hostile work environment claims. (Compl. ¶ 161). Retaliation claims under Title VII and FEHA require three elements. "[A] plaintiff must show (1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." *Brooks v. City of San Mateo*, 229 F.3d 917, 923, 928 (9th Cir. 2000); *Bergene v. Salt River Project Agr. Imp. & Power Dist.*, 272 F.3d 1136, 1141 (9th Cir. 2001). Under Title VII, the second element requires that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse [in that] it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted); *Poland*, 494 F.3d at 1180. FEHA requires that the adverse action be conduct that "materially affect[s] the terms and conditions of employment." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1036 (Cal. 2005). "Logic demands that any protected activity engaged by a plaintiff . . . must *precede* the defendant's retaliatory act." *Pratt v. Delta Air Lines, Inc.*, No. 2:14-CV-00815, 2015 WL 2153397, at *16 (C.D. Cal. May 4, 2015) (internal citations omitted) (emphasis in original).

In moving for summary judgment, ProTec argues that Swirski cannot establish a prima facie case for retaliation because she didn't engage in "protected activity" under Title VII and FEHA. (Dkt. 32-2 at 25). As support for this argument, ProTec points out that Swirski never complained about age discrimination to Rauch or Allen during her employment, nor has she presented any evidence suggesting that she informed anyone from ProTec's management about such alleged discrimination. (Dkt. 35 at 9).

Swirski doesn't refute this argument, but merely makes the unsupported contention that she "engaged in a protected activity because she opposed and notified executive team members of the discrimination and differential treatment that was occurring." (Dkt. 34-1 at 24). In support, she cites three instances of allegedly adverse actions, including when: 1) Rauch inadvertently sent the August 2016 email; 2) Swirski volunteered for DiSC training and was asked how long she intended to remain at the company; and 3) Swirski asked that members of the executive team stay in their "respective lanes" with respect to communicating with counsel about an ongoing legal matter. (*Id.* at 24–25).

But such events don't amount to protected activity sufficient to form the basis of a retaliation claim. By her own summarization of the relevant facts, Swirski never actually complained, either formally or informally, about age discrimination to anyone at ProTec. None of the instances she mentions even reference age, and at least two of those instances appear to relate more to personal grievances in the workplace rather than to unlawful discriminatory behavior. For instance, Swirski relies on Rauch's comments to her August 2016 "Leaders who don't listen email" email as evidence of protected activity, but the email exchange and her discussion with Rauch afterward made no reference to her age, nor did the email

clearly convey to any recipient that Swirski was complaining of discrimination or illegal wrongdoing of any kind. Even when presented with the opportunity to make such a complaint to Rauch during their discussion afterward, she did not do so. As noted by the California Supreme Court in *Yanowitz,* "complaints about personal grievances or vague or conclusory remarks that fail to put an employer on notice as to what conduct it should investigate will not suffice to establish protected conduct [for purposes of establishing a prima facie case on a FEHA retaliation claim]." *Yanowitz,* 36 Cal. 4th at 1043; *see also Day v. Sears Holdings Corp.*, 930 F. Supp. 2d 1146, 1177 (C.D. Cal. 2013) (finding that the plaintiff failed to establish a *prima facie* case of retaliation where the plaintiff "has adduced no evidence that she complained to her supervisors, or anyone else, regarding defendants' alleged gender discrimination").

And even if Swirski could establish that her complaints constituted protected activity, she has not proffered any admissible evidence to satisfy the third prima facie element of causal connection between her complaints and her constructive discharge. (*See* Dkt. 34-1 at 25). The evidence presented does not suggest that the assignment of certain tasks to other employees or the involvement of executive team members in HR-related matters were motivated by retaliatory purposes. Moreover, Swirski neglects to address the years-long time gap between some of the offending conduct, like the August 2016 email exchange, and her alleged constructive discharge in November 2019. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (holding that an adverse employment action must be "very close" in time to the plaintiff's complaints for there to be sufficient evidence of causality for a retaliation claim).

Accordingly, the Court **GRANTS** summary judgment as to Swirski's fifth and sixth claims for retaliation under Title VII and FEHA, respectively.

23

### E. Failure to Prevent Retaliation and Harassment

ProTec argues that Swirski's eighth and ninth claims for failure to prevent retaliation and harassment, respectively, must fail because Swirski can't prevail on her underlying claims for discrimination and retaliation. Indeed, because Swirski has failed to sufficiently allege that she was discriminated against or harassed, her claims for failure to prevent retaliation and harassment under FEHA fail. Thus, the Court **GRANTS** summary judgment as to Swirski's eighth and ninth claims. *See Blount v. Morgan Stanley Smith Barney, LLC*, 624 F. App'x 965, 966 (9th Cir. 2015) ("[Plaintiff] has failed to sustain an underlying discrimination or retaliation claim upon which he can base a failure to prevent claim."); *Goins v. Cty. of Merced*, 185 F. Supp. 3d 1224, 1241 (E.D. Cal. 2016) ("Because the court concludes that [Plaintiff]'s claims of retaliation cannot stand as a matter of law, summary judgment as to his claim for failure to prevent retaliation is also warranted in favor of defendants, and those claims must likewise be dismissed."); *Cozzi v. Cty. of Marin*, 787 F. Supp. 2d 1047, 1073 (N.D. Cal. 2011) (citing *Trujillo v. North County Transit Dist.,* 63 Cal.App.4th 280, 288–89, 73 Cal. Rptr. 2d 596 (1998)) ("[N]o suit may be maintained for violation of this affirmative duty if the plaintiff has not actually suffered any employment discrimination or harassment.").

### F. Unfair Business Practices

Swirski's UCL claim likewise fails. She claims that ProTec is "conducting unlawful and unfair business practices in violation of § 17200." (Dkt. 34-1 at 29). "By proscribing any unlawful business practice, the UCL borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Alvarez v. Chevron Corp.*, 656 F.3d 925, 933 n.8 (9th Cir. 2011) (alteration and internal quotation marks omitted). Thus, "[i]f a

24

plaintiff cannot state a claim under the predicate law, however, [the UCL] claim also fails." *Stokes v. CitiMortgage, Inc.*, 2014 WL 4359193, at *11 (C.D. Cal. Sept. 3, 2014) (internal quotation marks omitted); *Eidmann v. Walgreen Co.*, 522 F. Supp. 3d 634, 647 (N.D. Cal. 2021), *appeal dismissed*, No. 21-15659, 2021 WL 4785889 (9th Cir. May 17, 2021) (finding that the UCL's unfair prong can't survive "when plaintiff's claim under the unfair prong overlaps entirely with the conduct alleged in the fraudulent and unlawful prongs of the UCL").

Here, because Swirski's claims under the ADEA, FEHA, and Title VII fail, her UCL claim must fail. ProTec's Motion as to Swirski's tenth claim is therefore **GRANTED**.

## G. Intentional Infliction of Emotional Distress

ProTec's motion for summary judgment on Swirski's eleventh claim for IIED is likewise granted. An IIED claim requires a plaintiff to allege: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Hughes v. Pair*, 46 Cal. 4th 1035, 1050, 209 P.3d 963, 976 (2009) (citation omitted). Conduct is "outrageous when it is so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id.* (internal quotation marks omitted).

In this case, none of that conduct is so "extreme and outrageous" that it goes "beyond all possible bounds of decency" and would be regarded as "atrocious, and utterly intolerable in a civilized community." *Alcorn v. Anbro Eng'g, Inc.*, 2 Cal. 3d 493, 499 n.5, 468 P.2d 216, 219 (1970). As discussed previously, Swirski has offered evidence of various instances of workplace tension between herself and other members of the

executive team, including Rauch and Allen. But while Swirski may have found comments about her retirement or her technological proficiency to be offensive or even humiliating, "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" experienced in the workplace are not considered outrageous conduct sufficient to successfully allege an IIED claim. *Cole v. Fair Oaks Fire Prot. Dist.*, 43 Cal. 3d 148, 155 n.7, 729 P.2d 743, 746 (1987) (quoting Restatement (Second) of Torts § 46 comment d); *see Yurick v. Superior Ct.*, 209 Cal. App. 3d 1116, 1129, 257 Cal. Rptr. 665, 671 (Ct. App. 1989), *modified* (May 18, 1989) ("Depending on the idiosyncrasies of the plaintiff, offensive conduct which falls along the remainder of the spectrum may be irritating, insulting or even distressing but it is not actionable and must simply be endured without resort to legal redress."). Similarly, the commentary or actions taken in response to Swirski's workplace performance are not the type of conduct considered extreme or outrageous. For instance, Rauch's criticism of Swirski's "Leaders who listen" email, intervention in Swirski's handling of a litigation matter, or comments about employee complaints made about her are more suggestive of common microaggressions that typically occur in a workplace environment rather than conduct severe enough to cause emotional distress. *See Cha v. Kaiser Permanente*, No. C-14-4672-EMC, 2015 WL 3758287, at *10 (N.D. Cal. May 6, 2015) (quoting *Kasperzyk v. Shetler Sec. Servs., Inc.*, No. C-13-3358 EMC/TEH, 2015 WL 1348503, at *12 (N.D. Cal. Mar. 25, 2015)) ("[P]ersonnel management decisions [which] are improperly motivated do not involve outrageous conduct sufficient to support an IIED claim.") (internal quotation marks omitted); *Mcclelland v. Permanente Med. Grp., Inc.*, No. 2:11-CV-1224-LKK-EFB, 2013 WL 1195032, at *15 (E.D. Cal. Mar. 22, 2013). ("Similarly, discipline and criticism that are a normal part of the

26

1   employment relationship do not constitute 'outrageous' conduct, even if it

2   is intentional and malicious.").

3          There is a "high bar" that a plaintiff must meet in order to show

4   severe emotional distress for purposes of an IIED claim. *Hughes*, 46 Cal.

5   4th at 1051. And based on the evidence presented, Swirski is plainly

6   unable to meet this high standard. Therefore, the Court **GRANTS**

7   summary judgment in favor of ProTec as to the eleventh cause of action

8   for IIED.

9                    **H. Negligent Infliction of Emotional Distress**

10         Under California law, the "negligent causing of emotional distress is

11  not an independent tort but the tort of negligence." *Marlene F. v. Affiliated*

12  *Psychiatric Med. Clinic, Inc.*, 48 Cal. 3d 583, 588, 770 P.2d 278, 281

13  (1989) (citing 6 Witkin, *Summ. Cal. Law* Torts § 838 (9th ed.1988)). A

14  claim for negligence under California law requires that a plaintiff allege

15  that (1) the defendant owed the plaintiff a duty of care, (2) the defendant

16  breached that duty, (3) that the breach was the legal and proximate cause

17  of the plaintiff's injury, and (4) the plaintiff suffered damages. *Paz v. State*

18  *of California*, 22 Cal. 4th 550, 559, 994 P.2d 975, 980 (2000). To state a

19  claim for negligence, Swirski must point to *negligent* conduct that

20  fundamentally caused the harm. *Tu v. UCSD Med. Ctr.*, 201 F. Supp. 2d

21  1126, 1131 (S.D. Cal. 2002) (citing *Molien v. Kaiser Found. Hosps.*, 27

22  Cal. 3d 916, 921, 616 P.2d 813, 815 (1980)).

23         In support of her NIED claim, Swirski contends that Rauch's August

24  2016 email and the questions posed by Allen and Chavez about her future

25  employment plans caused her "severe and extreme mental and emotional

26  distress, including but not limited to anguish, humiliation, embarrassment,

27  loss of confidence, fright, depression, and anxiety." (Compl. ¶¶ 238, 248).

28  But the alleged conduct here, like most "misconduct attributed to the

27

employer" generally, consists of "actions which are a normal part of the employment relationship, such as demotions, promotions, criticism of work practices, and frictions in negotiations as to grievances." *Cole,* 43 Cal.3d at 160. In such a case, "an employee is confined to workers' compensation recovery for emotional injuries negligently inflicted as part of the normal employment relationship." *Robomatic, Inc., v. Vetco Offshore*, 225 Cal. App. 3d 270, 275, 275 Cal. Rptr. 70, 73 (Ct. App. 1990). Therefore, Swirski's allegations cannot support a claim for negligent infliction of emotional distress.

Moreover, courts have held that such discrimination as alleged here is inherently "intentional" conduct—not negligent conduct—and therefore not within the scope of a NIED claim. *See Tu*, 201 F. Supp. 2d at 1131. Indeed, Swirski's NIED claim, like her IIED claim, relies on the same set of allegations regarding adverse employment actions taken by ProTec. Even though the intentionality of the conduct was not the basis of her IIED claim's failure, it does serve as the basis for the failure of her claim here. *See Edwards v. U.S. Fid. & Guar. Co.*, 848 F. Supp. 1460, 1466 (N.D. Cal. 1994), *aff'd*, 74 F.3d 1245 (9th Cir. 1996) (internal citations and quotation marks omitted) (""[W]here the conduct alleged is intentional, it cannot be used as a basis for a negligent infliction of emotional distress claim."); *Rascon v. Diversified Maint. Sys.*, No. 1:13-CV-1578 AWI JLT, 2014 WL 1572554, at *10 (E.D. Cal. Apr. 17, 2014) ("[Defendant]'s actions as described in the FAC appear to be intentional acts. As intentional acts, [Defendant]'s acts are not negligent and cannot form the basis of an NIED claim.") (citations omitted). Additionally, to the extent Swirski argues that ProTec failed to provide a work environment safe from discrimination after it was made aware of alleged discrimination against her, the Court has already found that none of the evidence presented suggests that ProTec

had any knowledge that Swirski was made the target of repeated discrimination or harassment in the workplace. (*Supra*, Section III.C).

Read in the light most favorable to Swirski, these allegations don't state a claim for negligence, and the Court therefore **GRANTS** summary judgment as to ProTec's twelfth cause of action.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment. Accordingly, Plaintiff's request for damages, including actual, compensatory, and punitive damages, as well as reasonable attorneys' fees and costs, is denied. All pending deadlines and hearing dates are vacated, and the Clerk is instructed to terminate this case.

**IT IS SO ORDERED**.

Dated:  December 6, 2021

Honorable Larry Alan Burns
United States District Judge